UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALYSSA SMITH,

       Plaintiff,

v.                                  CASE NO. 3:17-cv-519-J-39MCR

UNIVERSITY OF FLORIDA
JACKSONVILLE PHYSICIANS, INC.,

       Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Dismiss

Plaintiff's Complaint ("Motion") (Doc. 12) and Plaintiff's Response in Opposition

thereto ("Response") (Doc. 14). For the reasons stated herein, the undersigned

**RECOMMENDS** that the Motion be **DENIED**.

### I.    Background

On May 5, 2017, Plaintiff Alyssa Smith commenced this action against

University of Florida Jacksonville Physicians, Inc. ("UFJP") for alleged violations

---

[1] "Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; M.D. Fla. R. 6.02.

of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, the

Americans with Disabilities Act ("ADA") and the ADA Amendments Act

("ADAAA"), 42 U.S.C. § 12101, *et seq.*, and the Florida Civil Rights Act of 1992

("FCRA"), Fla. Stat. § 760.01, *et seq*.  (*See* Doc. 1.)

Plaintiff was employed by University of Florida Jacksonville Healthcare, Inc.

("UFJH") as a licensed practical nurse ("LPN") from January 27, 2014 until her

termination on May 12, 2016.  (*Id.* at ¶ 14.)  On or about June 30, 2016, UFJH

merged with UFJP and, as a successor, UFJP expressly assumed all debts and

liabilities of UFJH.  (*Id.* at ¶¶ 15-16.)  Therefore, Plaintiff names UFJP as

Defendant in this lawsuit.

In her Complaint, Plaintiff alleges that UFJP interfered with her FMLA

rights, retaliated against her, and took adverse employment actions against her

for asserting her FMLA rights by, among other things, subjecting her to unlawful

harassment and unwarranted discipline, discouraging her from taking FMLA

leave in order to care for her own serious health condition, failing to notify her of

the need to re-certify for FMLA leave, and terminating her employment.  (*Id.* at ¶¶

60, 70.)  Plaintiff also alleges that UFJP intentionally discriminated against her on

account of her disability and unlawfully retaliated against her for engaging in a

protected activity (*i.e.*, requesting reasonable accommodations), in violation of the

ADA and ADAAA by, among other things, failing to provide reasonable

accommodations, subjecting her to unlawful harassment and unwarranted discipline, and terminating her employment.  (*Id.* at ¶¶ 75, 78, 83, 86, 89, 93.) Plaintiff further alleges that UFJP intentionally discriminated against her on account of her disability and unlawfully retaliated against her for engaging in a protected activity (*i.e.*, requesting reasonable accommodations), in violation of the FCRA, by, among other things, failing to provide reasonable accommodations, subjecting her to unlawful harassment and unwarranted discipline, and terminating her employment.  (*Id.* at ¶¶ 102, 105, 110, 114, 117, 121, 126.)

On June 20, 2017, Defendant UFJP filed its Answer, Defenses, and Affirmative Defenses to Plaintiff's Complaint.  (Doc. 6.)  On August 8, 2017, Defendant filed the present Motion seeking dismissal of the Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, arguing that Plaintiff's claims are barred by the Eleventh Amendment to the Constitution of the United States.  (Doc. 12.)  On August 22, 2017, Plaintiff filed her Response to the Motion.  (Doc. 14.)  On November 3, 2017, Judge Davis referred the Motion for a report and recommendation.  (Doc. 18.)

## II.    Standard

Plaintiff bears the burden of establishing subject matter jurisdiction.  *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1248 n.2 (11th Cir. 2005). A party may attack subject matter jurisdiction under Rule 12(b)(1) by either a

facial attack or a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (per curiam). "Facial attacks on the complaint require[] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [the] complaint are taken as true for the purposes of the motion." *Id.* at 1529 (internal quotation marks omitted). "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true." *Id.*

"Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (internal quotation marks omitted). With factual attacks, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* Further, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

Here, Defendant challenges the existence of subject matter jurisdiction in fact and submits documents in support of its position, including the Affidavit of Timothy Reinschmidt. (*See* Doc. 12-1.) Because Defendant makes a factual attack on the Complaint, no presumptive truthfulness attaches to Plaintiff's

4

allegations.

### III.    Discussion

#### A.    The Parties' Positions

Defendant argues that it is an arm of the State of Florida and, as such, the Court lacks subject matter jurisdiction over Plaintiff's federal FMLA and ADA claims, because those claims are barred by the Eleventh Amendment to the Constitution of the United States.  Defendant further argues that Plaintiff's pendent state law claims under the FCRA are similarly barred by the Eleventh Amendment.  Therefore, Defendant seeks dismissal of the entire Complaint.

Plaintiff responds that Defendant is a private corporation that is solely responsible for its own acts and, as such, it cannot be deemed an agent or instrumentality of the State.  Plaintiff states that although Defendant has administrative connections with the University of Florida ("UF") on a macro level, its day-to-day operations, particularly any employment related functions as to non-managerial employees, are not under State control.  Plaintiff points out that although Defendant receives some funds directly from the State, the vast majority of Defendant's funds come from other sources.  Plaintiff also points out that the funds used to satisfy Defendant's debts, liabilities, and obligations must be provided directly by Defendant, as noted in Fla. Stat. § 1004.29(1).  Finally, Defendant is solely responsible for any judgment against it pursuant to Fla. Stat.

§ 1004.29(1).

### B.    Evidence Presented in Support of the Motion

One of the documents submitted in support of Defendant's Motion is the

Affidavit of Timothy Reinschmidt.  (*See* Doc. 12-1.)  Mr. Reinschmidt is currently

employed by UFJP as the Vice President ("VP") of Finance.  (Reinschmidt Aff. ¶

2.)  His Affidavit provides in relevant part:

> 4.    [UFJH] was a Florida not-for-profit corporation established by
> the University of Florida Board of Trustees ("UFBOT") as a
> Health Services Support Organization ("HSSO") on October 9,
> 1996, under § 1004.29, Florida Statutes and Board of
> Governors for the State University System of Florida ("BOG")
> regulation BOG 9.011.  UFJH operated for the benefit of UF's
> Health Science Center by providing practice management
> services and other support to the physicians and operations of
> UF's College of Medicine Jacksonville, including but not limited
> to human resources, payroll, accounts payable, and
> employment of office and clinical support staff. . . .
>
> 5.    UFJP is a Florida not-for-profit corporation established by
> UFBOT as a Faculty Practice Plan under to [sic] BOG 9.017
> whose purpose is to support the missions of the [UF] College
> of Medicine Jacksonville and its supporting organizations. . . .
>
> 6.    In part because UFJH and UFJP "share a common mission of
> providing practice management services in support of the [UF]
> College of Medicine–Jacksonville," the Board of Directors of
> UFJH and [the] Board of Directors of UFJP voted on March 30,
> 2016, to merge the two entities effective June 30, 2016, with
> UFJP being the surviving corporation.  UFJH's status as a[n]
> HSSO was transferred by UFBOT to UFJP (on April 1, 2016,
> UFBOT certified UFJP as a[n] HSSO effective June 30, 2016).
> . . .
>
> 7.    UF's Internal Operating Memorandum ("IOM") 07-22 was

adopted by UFBOT, in accordance with § 1004.29, Florida Statutes, and BOG 9.011.  IOM 07-22 sets forth the procedures for the establishment and operation of UF HSSOs such as UFJH.  Pursuant to IOM 07-22, a UF HSSO must support the teaching, research, and service missions of UF's Health Science Center. . . .

8.   In accordance with the pre-merger version of UF's IOM 01-1, UFJH's Board of Directors included a non-Trustee representative of UFBOT.  As provided in the first footnote in IOM 01-1, UFBOT had delegated its authority to the UF President to make that appointment. . . .

9.   Prior to UFJH's merger into UFJP, UFBOT and/or the UF President (or their designees) maintained control and oversight over (1) UFJH's Board of Directors; (2) review and approval of UFJH's Articles of Incorporation and Bylaws (review and approval of amendments delegated to the UF President); (3) UFJH's operating budget (approval by the UF President with oversight by UFBOT); (4) UFJH's annual financial audits (review by the UF President with oversight by UFBOT); (5) the use of UF resources by UFJH; (6) the use of the UF's name by UFJH; (7) UFJH's compliance with federal and state laws and rules; (8) UFJH policies; (9) UFJH's ability to lease and sublease real property (approval by UF's Office of the General Counsel); (10) construction funded by UFJH; and (11) the initial establishment of and the ability to terminate UFJH's status as a[n] HSSO. . . .

10.   Since June 30, 2016, when UFJH's status as a university HSSO was effectively transferred to UFJP, the state has maintained the same control over UFJP that it had maintained over UFJH, as described in paragraph 8. . . .

11.   UFJP, as a Faculty Practice Plan, collects and distributes the fees billed for services rendered by physicians in UF's faculty practice for the exclusive benefit of UF and its supporting organizations.

12.   UFJH's and UFJP's fiscal year runs from July 1 to June 30.

13.  UFJH derived approximately 90% of its funding from UFJP.

14.  UFJH derived 5-6% of its funding from Shands Jacksonville Medical Center, Inc.'s ("Shands Jacksonville") general fund.

15.  UFJP derives approximately two-thirds of its funding from the monies collected for services rendered by physicians in UF's faculty practice.  In the 2015/2016 fiscal year, over half of the fees billed and 40% of net patient collections were paid by state Medicare or Medicaid funds.

16.  UFJP derives approximately 10% of its funding from Florida's Upper Payment Limit Program, which is also funded out of the state's treasury.

17.  UFJP derives approximately 16% of its funding from Shands Jacksonville's general fund, which is substantially funded by state Medicare and Medicaid funds from its own patient collections and from the Medicaid funded Safety Net Disproportionate Share Hospital program.  Shands Jacksonville receives funding from the Safety Net Disproportionate Share Hospital program because it serves a disproportionate share of poor and uninsured patients.

18.  UFJP derives approximately 2% of its funding from the state through state allocations to UF.

19.  Accordingly, UFJP derives approximately 55% of its funding directly or indirectly from the state.  As a result of UFJH deriving 90% of its funding from UFJP and 5-6% of its funding from Shands Jacksonville's general fund, UFJH derived approximately 50% of its funding indirectly from the state.

(Reinschmidt Aff. ¶¶ 4-19.)

Defendant also submits the Amended and Restated Articles of

Incorporation of UFJH ("Articles of Incorporation of UFJH"); the Fourth Amended

and Restated Bylaws of UFJH ("Bylaws of UFJH"); the Amended and Restated

Articles of Incorporation of UFJP ("Articles of Incorporation of UFJP"); the Fifth

Amended and Restated Bylaws of UFJP ("Bylaws of UFJP"); the Corporate

Resolution of the Board of Directors of UFJH Approving the Merger with UFJP,

the Articles of Merger, and the Plan of Merger; the Corporate Resolution of the

Board of Directors of UFJP Approving the Merger with UFJH, the Articles of

Merger, and the Plan of Merger; UF's IOM No. 07-22; BOG 9.011; and UF's IOM

No. 01-1.

These documents show that UFJH, a Florida not-for-profit corporation, was

organized under the provisions of Chapter 617 of the Florida Statutes as an

HSSO pursuant to Fla. Stat. § 1004.29 and UFBOT IOM No. 07-22, for scientific,

educational, and charitable purposes, including, *inter alia*, providing support for

UF and its affiliated entities, such as UFJP. (Doc. 12-1 at 8-9, 28, 33.) Pursuant

to the Articles of Incorporation of UFJH, the corporation would have perpetual

existence unless dissolved according to the laws of the State of Florida and the

rules and policies of UFBOT. (*Id.* at 10.) Upon dissolution, all remaining assets

after payment of expenses shall be disbursed to the University of Florida

Foundation, Inc., for use only by the UF College of Medicine. (*Id.* at 11.)

Further, all amendments to the Articles of Incorporation and the Bylaws of

UFJH are subject to approval by the President of UF. (*Id.*) The President of UF

shall at all times retain control over the use of the UF name and resources to

ensure that UFJH's activities are consistent with and supportive of the missions of UF and applicable state and federal laws and rules.  (*Id.*)

According to the Bylaws of UFJH, the voting members of the Board of Directors of UFJH include, *inter alia*, the President of UF or his/her designee; the Senior Associate Dean for Clinical Affairs of the UF College of Medicine – Jacksonville; a non-Trustee representative appointed by the Chairperson of UFBOT; the UF Vice President for Business Affairs or his/her designee; the Chairperson of each of the clinical departments of the UF College of Medicine – Jacksonville; and the Director of UF/Shands Jacksonville Cardiovascular Center. (*Id.* at 18.)  The appointment or election of Board members must be ratified by the President of UF before taking effect.  (*Id.*)  Also, any Director may be removed for cause by the President of UF.  (*Id.* at 19.)

UFJH's Board of Directors may select a Senior Vice President and Chief Financial Officer ("CFO") and may delegate the responsibility for the day-to-day management and operation of UFJH to them.  (*Id.* at 20.)  Except for the person so selected to be the Senior Vice President and CFO, only a person who is either a Chairperson of a clinical department of the UF College of Medicine – Jacksonville, a duly elected director at-large, the Dean of the Regional Campus – Jacksonville, the Senior Associate Dean for Clinical Affairs of the UF College of Medicine – Jacksonville, the Director of the UF/Shands Jacksonville

10

Cardiovascular Center, and is a member of the UFJH's Board of Directors, may serve as an officer of UFJH.  Further, the President and CEO of UFJH shall be appointed by the Board of Directors of UFJH based upon the recommendation of the Dean of the Regional Campus – Jacksonville and the prior approval of the President of UF and shall report to the President of UF or his/her designee and the Board of Directors.  (*Id.* at 21.)  The President may be removed for cause or unacceptable performance by the President of UF after consulting with the Board of Directors of UFJH.  (*Id.*)  A vacancy in the position of the Chairperson shall be filled by appointment of the President of UF.  (*Id.* at 22.)  In the case of the President, a vacancy shall be filled by appointment by the Dean of the Regional Campus – Jacksonville upon the prior consent of the President of UF.  (*Id.*)

One of the members of the Executive Committee of UFJH shall be the President of UF, who shall also approve an Audit Committee Charter to provide for oversight of the integrity of financial reporting, internal controls and the independence and performance of the audit function by the independent auditors of UFJH.  (*Id.* at 22-23.)  Board Committees must be ratified by the President of UF or his/her designee before taking effect, and any committee member may be removed for cause by the President of UF.  (*Id.* at 23.)

Any amendments to the Bylaws or to the Articles of Incorporation of UFJH shall not become effective until ratified by the President of UF as designee of

UFBOT.  (*Id.* at 24.)  Further, the affairs and operations of UFJH shall be conducted in compliance with the rules and standard practices of UFBOT.  (*Id.*)  Also, all financial records of UFJH shall be available to the appropriate UF personnel and each annual audited financial report shall be promptly exhibited to the President of UF, among others.  (*Id.*)  The proposed annual budget shall be submitted to the President of UF for approval.  (*Id.* at 25.)  Public access to UFJH's records and meetings shall be governed by Fla. Stat. § 1004.30.  (*Id.*)  Further, the President of UF shall at all times monitor and retain control over the use of the UF name and resources to ensure that UFJH's activities are consistent with and supportive of the missions of UF and applicable state and federal laws and rules.  (*Id.*)

Similar to UFJH, UFJP, a Florida not-for-profit corporation, was also organized under the provisions of Chapter 617 of the Florida Statutes, as a Faculty Practice Plan ("FPP"), for scientific, educational, and charitable purposes in support of the missions of the UF College of Medicine – Jacksonville and its supporting organizations, pursuant to BOG § 9.017 and UFBOT IOM No. 07-21.  (*Id.* at 27-28, 33, 41.)  Pursuant to the Articles of Incorporation, the President of UF confirms that UFJP's mission is to support one or more of the purposes of UF.  (*Id.* at 28, 41.)  UFJP has no power or authority to do anything in violation of Fla. Stat. § 1004.29 and the UF FPP as approved by UFBOT.  (*Id.* at 29, 42.)  UFJP

shall have perpetual existence unless dissolved according to the laws of the State of Florida and the rules and policies of UFBOT.  (*Id.*)

Amendments to the Articles of Incorporation of UFJP are subject to ratification by the Dean of the UF College of Medicine – Jacksonville, the Senior Vice President of UF, and the President of UF as designee of UFBOT.  (*Id.* at 30, 43.)  The President of UF shall at all times retain control over the use of the UF name and resources to ensure that UFJP's activities are consistent with and supportive of the missions of UF and applicable state and federal laws and rules. (*Id.*)

The purposes for which UFJP was organized are set forth in the Articles of Incorporation, Fla. Stat. § 1004.29, § 1004.30, and § 617.0302, and the UFBOT IOM No. 07-21 and No. 07-22.  (*Id.* at 46.)  The property, affairs, activities, and concerns of UFJP shall be managed by its Board of Directors, except as required by law or UFBOT policy.  (*Id.* at 47.)  The Directors of UFJP shall be full voting members of the Board of Directors and shall include, *inter alia*, the President of UF or his/her designee; the Dean of the UF College of Medicine – Jacksonville; the Senior Associate Dean for Clinical Affairs of the UF College of Medicine – Jacksonville; a representative of UFBOT; the UF Chief Operating Officer ("COO"), CFO, or Vice President for Business Affairs, or a designee for any of them; the Chairperson of each of the clinical departments of the UF College of Medicine –

Jacksonville; and the Director of the UF Health Cardiovascular Center –

Jacksonville.  (*Id.* at 48.)  A Director may be removed for cause by the President

of UF after consultation with the Board of Directors of UFJP, among others.  (*Id.*

at 49.)

Further, the Board of Directors may delegate the responsibility for the day-

to-day management and operation of UFJP to its Vice President/CFO and Vice

President/COO.  (*Id.* at 50.)  The Vice President/CFO shall oversee the day-to-

day management and operation over his/her respective areas of responsibility

and shall be accountable directly to the President of UF and the Board of UFJP.

(*Id.* at 52.)  The Vice President/CFO is appointed based upon the

recommendation of the Dean of the UF College of Medicine – Jacksonville and

the prior approval of the President of UF.  (*Id.* at 51.)  The Vice President/COO

shall oversee the day-to-day management and operation over his/her respective

areas of responsibility and shall be accountable directly to the President of UF

and the Board of UFJP.  (*Id.* at 52.)  The Vice President/COO is appointed based

upon the recommendation of the Dean of the UF College of Medicine –

Jacksonville and the prior approval of the President of UF.  (*Id.*)

The Chairperson of the Board is the Dean of the UF College of Medicine –

Jacksonville; the President/CEO is the Senior Associate Dean for Clinical Affairs.

(*Id.* at 51.)  A vacancy in the position of the Chairperson shall be filled by

14

appointment of the President of UF; a vacancy in the position of the
President/CEO shall be filled by the Dean of the UF College of Medicine –
Jacksonville upon prior consent of the President of UF.  (*Id.* at 52.)  Any Officer
may be removed for cause or unacceptable performance by the President of UF.
(*Id.* at 52-53.)

Any amendments to the Articles of Incorporation and the Bylaws shall not
become effective until ratified by the Dean of the UF College of Medicine –
Jacksonville, the Senior Vice President for Health Affairs, and the President of
UF.  (Doc. 12-1 at 56.)  The affairs and operations of UFJP shall be conducted in
strict compliance with UFBOT IOM No. 07-21 and No. 07-22.  (*Id.*)  The operating
budget shall be recommended by the Dean of the UF College of Medicine –
Jacksonville and the Senior Vice President for Health Affairs, and shall be
submitted for approval to the President of UF.  (*Id.* at 57.)  The funds, books, and
vouchers in the Secretary/Treasurer's hands shall at all times be under the
supervision of the Dean of the UF College of Medicine – Jacksonville and subject
to his/her inspection and control.  (*Id.* at 52.)  The President of UF shall monitor
and retain control over the use of the UF name and resources to ensure that
UFJP's activities are consistent with the missions of UF and applicable laws.  (*Id.*
at 57.)

As stated in the Corporate Resolution Approving the Merger, "UFJH and

UFJP are both not for profit corporations that share a common mission of

providing practice management services in support of the [UF] College of

Medicine – Jacksonville." (*Id.* at 33.)  When UFJH merged into UFJP effective

June 30, 2016, with UFJP being the surviving not-for-profit corporation, UFJH's

status as an HSSO was transferred to UFJP, and UFJP assumed all of the debts

and liabilities of UFJH.  (*Id.* at 28, 34.)  The merger contemplated compliance with

Fla. Stat. § 1004.29 and § 1004.30, and UFBOT IOM No. 07-22.  (*Id.* at 41.)

IOM No. 07-22 sets forth the procedures for the establishment and

operation of UF HSSOs.  (*Id.* at 60.)  It provides that pursuant to Fla. Stat. §

1004.29, "each HSSO shall have sole responsibility for its acts, debts, liabilities,

and obligations and that in no event shall the state or the university have any

responsibility for such acts, debts, liabilities, and obligations." (*Id.*)  It also

provides that "[t]he BOT has an oversight responsibility for HSSOs because they

are supporting organizations of the University." (*Id.* at 61.)  It further provides as

follows:

> G.    Florida Retirement System and Salary Supplements.
>     1.    Full or part-time employees of HSSOs may not
>           participate in the State of Florida Retirement System.
>           Other fringe benefits available to [UF] employees may
>           be made available to HSSO employees if allowed by law
>           and approved by [UFBOT].
>     2.    Salary supplements provided for [UF] employees must
>           be approved by the President of the University or his/her
>           designee. . . .
> H.    Personnel Policies.  HSSOs with employees must have

> appropriate personnel policies, including discrimination and
> sexual harassment policies.
>
> . . .
>
> J.    Insurance. HSSOs shall follow good business practices and all
> applicable legal requirements to obtain appropriate insurance
> protection in amounts sufficient to adequately protect the assets of
> the HSSO.

(*Id.* at 67.)  Further, the President of UF may recommend at any time to UFBOT

that an organization's status as an HSSO be terminated.  (*Id.* at 68.)  "Any

recommendation for termination of HSSO status shall include a plan for the

disposition of the corporation's assets and liabilities."  (*Id.* at 69.)

## C.    Analysis

"The Eleventh Amendment protects a State from being sued in federal

court without the State's consent.  As a result, parties with claims against a non-

consenting State must resort to the State's own courts."  *Manders v. Lee*, 338

F.3d 1304, 1308 (11th Cir. 2003).

> It is . . . well-settled that Eleventh Amendment immunity bars suits
> brought in federal court when the State itself is sued and when an
> "arm of the State" is sued.  To receive Eleventh Amendment
> immunity, a defendant need not be labeled a "state officer" or "state
> official," but instead need only be acting as an "arm of the State,"
> which includes agents and instrumentalities of the State.  Whether a
> defendant is an "arm of the State" must be assessed in light of the
> particular function in which the defendant was engaged when taking
> the actions out of which liability is asserted to arise.

*Id.* (internal citations omitted); *see also Baker v. Univ. Med. Serv. Ass'n, Inc.*,

Case No.: 8:16-cv-2978-T-30MAP, 2016 WL 7385811, *2 (M.D. Fla. Dec. 21,

17

2016) ("The analysis focuses on the particular function the defendant was engaged when taking the actions out of which liability is asserted to arise.").

In the Eleventh Circuit, four factors are used "to determine whether an entity is an 'arm of the State' in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309. "These factors are evaluated in light of the specific function at issue." *Stanley v. Israel*, 843 F.3d 920, 924 (11th Cir. 2016). "The entity invoking Eleventh Amendment immunity bears the burden of demonstrating that the *Manders* factors weigh in its favor." *Miller v. Advantage Behavioral Health Sys.*, 677 F. App'x 556, 559 (11th Cir. Jan. 26, 2017) (per curiam).

"The issue of whether an entity is an 'arm of the State' for Eleventh Amendment purposes is ultimately a question of federal law. But the federal question can be answered only after considering provisions of state law." *Manders*, 338 F.3d at 1309. Therefore, we start by examining the governmental structure of the entity vis-á-vis the State; next, we outline the functions performed by the entity; and then, we apply the four factors to the entity's functions at issue. *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003).

The Court starts with the governmental structure of UFJH/UFJP. UFJH, a

18

Florida not-for-profit corporation, was organized as an HSSO pursuant to Fla. Stat. § 1004.29 and UFBOT IOM No. 07-22, for scientific, educational, and charitable purposes to support UF and its affiliated entities. (Doc. 12-1 at 8-9, 28, 33.) Under Fla. Stat. § 1004.29, each university HSSO "shall be a Florida corporation not for profit, incorporated under the provisions of chapter 617 and approved by the Department of State." Fla. Stat. § 1004.29(2). While each state university is authorized to establish HSSOs, which have the ability to enter into arrangements with other entities as providers in other integrated health care systems or similar entities, for the benefit of the university academic health sciences center, HSSOs "shall have sole responsibility for the acts, debts, liabilities, and obligations of the organization" and "[i]n no case shall the state or university have any responsibility for such acts, debts, liabilities, and obligations incurred or assumed by university health services support organizations." Fla. Stat. § 1004.29(1). UFJH's status as an HSSO was transferred to UFJP as a result of the merger of the two corporations, with UFJP being the surviving entity. (Doc. 12-1 at 28, 34.) As a result of the merger, UFJP assumed all debts and liabilities of UFJH. (*Id.*) Based on the governmental structure of UFJH/UFJP, there is no indication that Florida law viewed these entities as arms of the State of Florida.

Further, both entities were organized to provide practice management

19

services in support of the UF College of Medicine – Jacksonville.  (*Id.* at 33.)

UFJH was organized as an HSSO for scientific, educational, and charitable

purposes, including providing support for UF and its affiliated entities.  (*Id.* at 8-9,

28, 33.)  UFJP was originally organized as an FPP for scientific, educational, and

charitable purposes in support of the missions of the UF College of Medicine –

Jacksonville and its supporting organizations, and after the merger, assumed the

status of an HSSO.  (*Id.* at 27-28, 33, 41.)  UFJP's mission was to support one or

more of the purposes of UF.  (*Id.* at 28, 41.)

However, Plaintiff's claims in this action arise from employment actions

taken by UFJH in 2015 and 2016.  (Doc. 1, ¶¶ 30-48.)  Although UFJH functioned

as an HSSO of UF at that time, the question is not whether UFJH was an arm of

the State in carrying out its general functions as an HSSO, but rather whether

UFJH was an arm of the State in carrying out its employment-related functions.

*See Miller*, 677 F. App'x at 559 ("[Plaintiff's] ADEA discrimination claim arises

from her allegedly wrongful termination by [Defendant].  As such, the question

presented is whether [Defendant] acts as an arm of the State in making hiring

and firing decisions in the ordinary course of business."); *Stanley*, 843 F.3d at

922 ("This case arises from the Broward County Sheriff's potential liability under §

1983 for failing to rehire a former deputy allegedly due to his political loyalties and

in violation of his First Amendment rights. . . . [T]hus, at issue in this case is the

basic question whether a Florida county sheriff, acting in his capacity as chief correctional officer in the hiring and firing of his deputies, is an arm of the state entitled to the benefit of the state's Eleventh Amendment immunity from suit in federal court.").

With this particular function in mind, the Court turns to the first *Manders* factor, which focuses on how State law defines UFJH/UFJP. Under Florida law, HSSOs, such as UFJH and UFJP, are defined as Florida not-for-profit corporations incorporated under the provisions of Chapter 617 of the Florida Statutes and approved by the Department of State. Fla. Stat. § 1004.29(2). HSSOs have the ability to enter into arrangements with other entities as providers in other integrated health care systems or similar entities, for the benefit of the university academic health sciences center, but each HSSO "shall have sole responsibility for the acts, debts, liabilities, and obligations of the organization" and "[i]n no case shall the state or university have any responsibility for such acts, debts, liabilities, and obligations incurred or assumed by university health services support organizations." Fla. Stat. § 1004.29(1). As such, Florida law does not seem to view UFJH/UFJP as State agencies. Therefore, the first *Manders* factor weighs against a finding of arm-of-the-State status for UFJH/UFJP.

"The second *Manders* factor requires us to determine the degree of control

the State maintains over the activity from which the defendant's alleged liability arises." *Miller*, 677 F. App'x at 560; *Keene v. Prine*, 477 F. App'x 575, 577 (11th Cir. May 15, 2012) (per curiam) (stating that the second *Manders* factor involves a determination of "what degree of control the state maintains over the Sheriff's Office in making personnel decisions"). The question here is whether the State of Florida exercises meaningful control over Defendant's employment-related functions, such as hiring and firing of non-managerial employees, in the ordinary course of business. *Miller*, 677 F. App'x at 560. Although this factor is close, it appears to weigh in favor of arm-of-the-State status.

There is no doubt that UF, which is an arm of the State of Florida,[2] through its President, other officials, and UFBOT exercised high-level control and oversight over UFJH/UFJP. (*See* Doc. 12-1 at 24 (stating that the affairs and operations of UFJH shall be conducted in compliance with the rules and standard practices of UFBOT[3]); *Id.* at 29 & 42 (stating that UFJP had no power or authority

---

[2] "It is well settled in Florida that state universities, and their [BOTs], are arms of the state that are entitled to Eleventh Amendment immunity." *Baker*, 2016 WL 7385811 at *2; *see also Paylan v. Teitelbaum*, Case No. 1:15-cv-159-MW-GRJ, 2017 WL 2294084, *2 (N.D. Fla. May 23, 2017) (determining that UF and UFBOT are State agencies and arms of the State for purposes of Eleventh Amendment immunity), report and recommendation adopted in 2017 WL 2294083 (N.D. Fla. May 25, 2017).

[3] This is consistent with Fla. Stat. § 1004.29(3), which provides in part: "A state university [BOT], in accordance with rules and guidelines of the Board of Governors, may prescribe, by rule, conditions with which a university [HSSO] must comply in order to be certified and to use property, facilities, or personal services at any state university. The rules must provide for budget, audit review, and oversight by the [BOT]." Also, pursuant to Fla. Stat. § 1001.706(3)(c)–(d): "The Board of Governors shall prescribe

22

to do anything in violation of Fla. Stat. § 1004.29 and the UF FPP, as approved

by UFBOT); *Id.* at 56 (stating that the affairs and operations of UFJP shall be

conducted in strict compliance with UFBOT IOM No. 07-21 and No. 07-22); *Id.* at

61 ("The BOT has an oversight responsibility for HSSOs because they are

supporting organizations of the University."); *Id.* at 68 (stating that the President

of UF may recommend at any time to the BOT that an organization's status as an

HSSO be terminated).)

     For example, the Articles of Incorporation and the Bylaws of UFJH/UFJP

were subject to approval by, *inter alia*, the President of UF; the President of UF

retained control over the use of the UF name and resources to ensure that

UFJH/UFJP's activities were consistent with the missions of UF; the appointment

or election of Board members and committees of UFJH had to be ratified by the

President of UF; any Director, Officer, or committee member of UFJH/UFJP could

be removed for cause by the President of UF; the President of UF, among other

UF officials, was a voting member of the Board of Directors of UFJH/UFJP and of

conditions for direct-support organizations and university [HSSOs] to be certified and to use university property and services. Conditions relating to certification must provide for audit review and oversight by the Board of Governors. . . . The Board of Governors shall develop guidelines for supervising [FPPs] for the academic health science centers." Further, pursuant to BOG 9.011(1)–(2): "Each [BOT] shall establish conditions with which a support organization must comply in order to use university property, facilities, or personal services . . . . The Director or [COO] of the support organization shall report to the University President or designee."

the Executive Committee of UFJH[4]; the President and CEO of UFJH reported to

the President of UF, among others; and the President of UF approved an Audit

Committee Charter and the proposed annual budget of UFJH/UFJP.

In addition to UF's high-level control and oversight over UFJH/UFJP, it

appears that UF also exercised control over Defendant's day-to-day operations.

According to the Bylaws of UFJP, the affairs, activities, and concerns of the

corporation shall be managed by its Board of Directors, except as required by law

or UFBOT policy.  (Doc. 12-1 at 47.)  The Board of Directors may select a Vice

President/CFO and Vice President/COO, and may delegate the responsibility for

the day-to-day management and operation of UFJP to its Vice President/CFO

and Vice President/COO.  (*Id.* at 50; *see also id.* at 20 (stating that the Board of

Directors of UFJH may select a Senior Vice President and CFO, and may

delegate the responsibility for the day-to-day management and operation of UFJH

to the Senior Vice President and CFO).)  The Vice President/CFO and Vice

President/COO, who are appointed by the Board of Directors of UFJP on the

recommendation of the Dean of the UF College of Medicine – Jacksonville and

the prior approval of the President of UF, and who serve at the pleasure of the

Board, shall oversee the day-to-day management and operation over their

---

[4] This is consistent with Fla. Stat. § 1004.29(4), which provides that "[t]he president of the university for which the university [HSSO] is established, or the president's designee, shall also serve on the board of directors and the executive committee of any university [HSSO] established to benefit that university."

respective areas of responsibility and shall be accountable directly to the President of UF and the Board of UFJP (*Id.* at 52).  *See Plancher v. UCF Athletics Ass'n, Inc.*, 175 So.3d 724, 728 (Fla. 2015) (finding that through UCF's President's choice and direct supervision of the director of athletics, UCF maintains and exercises actual control over UCFAA's day-to-day operations and activities because UCF's director of athletics (who is hired by, reports to, and serves at the pleasure and direction of UCF's President) serves as the executive vice president of UCFAA and manages the day-to-day activities of UCFAA).  *Cf. Miller*, 677 F. App'x at 558 (noting that while the community service board was subject to some high-level oversight by the state, daily operations and personnel matters were managed by locally elected boards and supporting staff); *Shands Teaching Hosp. & Clinics, Inc. v. Lee*, 478 So.2d 77, 79 (Fla. Dist. Ct. App. 1985) (concluding that Shands was not a corporation primarily acting as an instrumentality of the State because its day-to-day operations were not under direct state control).  Based on the foregoing, it appears that the second *Manders* factor weighs in favor of arm-of-the-State status.

The third factor is where Defendant derives its personnel funding.  *Keene*, 477 F. App'x at 577.  To answer it, "we focus primarily on the quantum of funding the State provides to the defendant entity."  *Miller*, 677 F. App'x at 563.

As stated in the Affidavit of Mr. Reinschmidt, UFJH provided practice

management services and other support to the physicians and operations of the UF's College of Medicine – Jacksonville, including but not limited to human resources, payroll, accounts payable, and employment of office and clinical support staff.  (Reinschmidt Aff. ¶ 4.)  UFJP, as an FPP, collects and distributes the fees billed for services rendered by physicians in UF's faculty practice for the exclusive benefit of UF and its supporting organizations.  (*Id.* at ¶ 11.)  The Affidavit further provides:

13.  UFJH derived approximately 90% of its funding from UFJP.

14.  UFJH derived 5-6% of its funding from Shands Jacksonville Medical Center, Inc.'s ("Shands Jacksonville") general fund.

15.  UFJP derives approximately two-thirds of its funding from the monies collected for services rendered by physicians in UF's faculty practice.  In the 2015/2016 fiscal year, over half of the fees billed and 40% of net patient collections were paid by state Medicare or Medicaid funds.

16.  UFJP derives approximately 10% of its funding from Florida's Upper Payment Limit Program, which is also funded out of the state's treasury.

17.  UFJP derives approximately 16% of its funding from Shands Jacksonville's general fund, which is substantially funded by state Medicare and Medicaid funds from its own patient collections and from the Medicaid funded Safety Net Disproportionate Share Hospital program.  Shands Jacksonville receives funding from the Safety Net Disproportionate Share Hospital program because it serves a disproportionate share of poor and uninsured patients.

18.  UFJP derives approximately 2% of its funding from the state through state allocations to UF.

19. **Accordingly, UFJP derives approximately 55% of its funding directly or indirectly from the state**.  As a result of UFJH deriving 90% of its funding from UFJP and 5-6% of its funding from Shands Jacksonville's general fund, UFJH derived approximately 50% of its funding indirectly from the state.

(*Id.* at ¶¶ 13-19 (emphasis added).)

Defendant argues that based on the foregoing, both UFJH and UFJP derive a significant amount of their funding either directly or indirectly from the State.  Plaintiff responds that despite receiving some funds directly from the State, the vast majority of funds received by UFJH and UFJP are derived from other sources.  Plaintiff points out that prior to the merger, UFJH received 90% of its funds from UFJP, not from UF or a State agency.  In turn, UFJP receives two-thirds of its funds from collections for services rendered by its physician employees, meaning that it is essentially self-funded and receives only minimal financial support from UF or the State's treasury.  Plaintiff adds that receipt of significant funds from Medicaid and Medicare does not in any way impute arm-of-the-State status.  Plaintiff further points out that any funds used to satisfy debts, liabilities, and obligations must be provided directly by UFJP, as stated in Fla. Stat. § 1004.29(1).

The undersigned agrees with Plaintiff that despite receiving some funds directly from the State, the vast majority of funds received by UFJH and UFJP are

derived from other sources,[5] which weighs against a finding of immunity and is

not outweighed by the fact that UF maintains some control over the budget and

financial affairs of UFJH/UFJP.[6]  *Stanley*, 843 F.3d at 929-30; *Abusaid v.*

*Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1311 (11th Cir. 2005)

("[O]ur inquiry on this third prong of our arm of the state test asks what is the

source of a sheriff's funds, not (as the second prong asks) what degree of control

the state retains over the budgeting process.").[7]  Even if State control over the

budgeting process were the proper inquiry, *Miller*, 677 F. App'x at 563 ("Where

relevant, we may also consider the level of control the State exercises over the

entity's funding structure, budget, and overall financial autonomy."), the third

factor would still weigh against immunity because Defendant has not shown

meaningful State control over its personnel funding, *see Abusaid*, 405 F.3d at

---

[5] Even if Defendant received significant funding from the State, generally that would not be sufficient to tilt the balance toward immunity.  *See Lightfoot v. Henry County School District*, 771 F.3d 764, 776 (11th Cir. 2014) (stating "it is not sufficient that the School District receives significant funding from the State").

[6] For example, the proposed annual budget of UFJH/UFJP is subject to approval by the President of UF.  (Doc. 12-1 at 25, 57.)  Also, the funds, books, and vouchers in the hands of the Secretary/Treasurer of UFJP shall at all times be under the supervision of the Dean of the UF College of Medicine – Jacksonville and subject to his/her inspection and control.  (*Id.* at 52.)

[7] Also, the fact that certain fringe benefits available to UF employees may be made available to HSSO employees if allowed by law and approved by UFBOT, pursuant to IOM No. 07-22, does not imply that Defendant is an arm of the State.  *See Johnson v. Ogeechee Behavioral Health Servs.*, 479 F. Supp. 2d 1357, 1364 (S.D. Ga. 2007) (stating that the fact that defendant's employees receive state benefits and are governed by the State Merit System does not evidence the fact that defendant itself is state-controlled).

1310 (stating there is no indication that the State funds the particular function at issue, *i.e.*, enforcement of county ordinances).

The final *Manders* factor is "whether the State would bear ultimate responsibility for an adverse judgment" against Defendant. *Miller*, 677 F. App'x at 564. "This final factor, though not alone determinative, . . . implicates the Eleventh Amendment's 'core concern' that 'the State will be in fact obligated to bear and pay' adverse judgments[.] This factor thus carries great weight in our analysis." *Keene*, 477 F. App'x at 579 (internal citations omitted).

Florida law addresses this factor directly by establishing that HSSOs, like UFJH/UFJP, "shall have sole responsibility for the acts, debts, liabilities, and obligations of the organization" and "[i]n no case shall the state or university have any responsibility for such acts, debts, liabilities, and obligations incurred or assumed by university [HSSOs]." Fla. Stat. § 1004.29(1). Although the Supreme Court does not require "an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity," *Manders*, 338 F.3d at 1327 (internal citations omitted), the statutory limitation of state liability for any judgment against Defendant weighs heavily against a finding that Defendant is an arm of the State. *See Miller*, 677 F. App'x at 564; *Keene*, 477 F. App'x at 579 ("To the extent that the state is insulated from paying any adverse judgment against [defendant], that entity's autonomy with respect to this 'core concern' of the Eleventh Amendment

weighs heavily in favor of denying immunity.").

Defendant acknowledges this statutory limitation, but argues that a judgment against it would indirectly implicate the State's treasury because a significant amount of UFJH/UFJP's funding originates from the State through Medicare, Medicaid, UF, the Upper Payment Limit program, and the Safety Net Disproportionate Share Hospital program.  The undersigned disagrees.  As stated earlier, despite receiving some funds directly from the State, the vast majority of funds received by UFJH and UFJP are derived from other sources.

Moreover, there is no evidence that the State "would be obligated or incentivized to prop up [Defendant] in the event of its financial distress or insolvency."  *Miller*, 677 F. App'x at 565.  In fact, pursuant to IOM No. 07-22, HSSOs, like UFJH/UFJP, "shall follow good business practices and all applicable legal requirements to obtain appropriate insurance protection in amounts sufficient to adequately protect the assets of the HSSO" (Doc. 12-1 at 67).  *See Abusaid*, 405 F.3d at 1312 (noting that Florida law authorizes sheriffs to purchase liability insurance for damages arising out of claims against them).[8]  Even assuming that UFJP would be unable to function due to financial distress, there is no indication that the corporation's services could not be undertaken by another

_____

[8] In *Baker*, the court reached a contrary conclusion on the fourth *Manders* factor because the State of Florida, Department of Insurance, Division of Risk Management was insuring defendant with respect to plaintiff's claims, and if a judgment were obtained against Defendant, any award to plaintiff would be paid from the State Risk Management Trust Fund.  *Baker*, 2016 WL 7385811 at *3.

private entity.  *Miller*, 677 F. App'x at 565.

As Defendant has not carried its burden of showing that the State treasury will be meaningfully implicated in Defendant's legal liabilities, the final *Manders* factor weighs against a finding that Defendant is an arm of the State for federal immunity purposes.  *Miller*, 677 F. App'x at 565; *Abusaid*, 405 F.3d at 1312 (stating that "the Eleventh Amendment's historical concern is much more precise—it is with 'judgments that must be paid out of a State's treasury,' . . . not with any judgment that may indirectly affect a state's finances"); *see also Johnson*, 479 F. Supp. 2d at 1366 ("States have authority to create a variety of subordinate governmental entities.  The Eleventh Amendment protects the State's arms, not its offspring. [Although these entities] require State money to operate, [they] cannot create any State debt or liability.").

Based on the foregoing, the undersigned finds that Defendant was not an arm of the State when it engaged in the employment-related matters alleged in the Complaint.  As such, Defendant is not entitled to Eleventh Amendment immunity.

Accordingly, it is respectfully **RECOMMENDED** that the Motion (**Doc. 12**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville Florida, on January 25, 2018.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Brian J. Davis
United States District Judge

Counsel of Record